IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAME GARA, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 10−cv−769−SCW |
| | ) |
| TRACY PEEK, DR. WAHL, and | ) |
| WEXFORD HEALTH SOURCES | ) |
| | ) |
|         Defendants. | |

## MEMORANDUM AND ORDER

**Williams, Magistrate Judge:**

Plaintiff filed this cause of action on October 4, 2010, alleging deliberate indifference to serious medical needs against various Defendants as a result knee injury he suffered while playing soccer at Pinckneyville Correction Center. (Doc. 1). The remaining Defendants filed this Motion for Summary Judgment (Doc. 93) on April 15, 2013. Plaintiff filed his Response on May 20, 2013. (Docs. 93 and 94). Defendants filed a Reply to Plaintiff's Response on June 3, 2013, making this Motion ripe for disposition. (Doc. 96). For the reasons below, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

### BACKGROUND

Pursuant to 42 U.S.C. § 1983, Rame Gara, then an inmate at Pinckneyville Correctional Center, sued five defendants on the theory Defendants violated his Eighth Amendment rights by showing deliberate indifference to his medical needs after he hurt his knee while playing soccer. Defendant Obadina was never properly served and was dismissed pursuant to Federal Rule of Civil Procedure 4(m). (Doc. 32). The Court granted Defendant Kelly's Motion for Summary Judgment

on August 24, 2012.  (Doc. 76).  Defendants Peek, Wahl, and Wexford Heath Sources remain in the case.

Plaintiff was playing soccer in the Pickneyville yard on May 3, 2009, when he fell while running and injured his knee.  (Pl's Dep. pp. 11-12).  At the time of the incident, he heard something crack in his knee.  (Pl's Dep. p. 12).  At his deposition, Plaintiff described the pain he experienced at that time as "11 out of 10."  (Pl.'s Dep. p. 13).  Plaintiff was helped to his cell by the other inmates.  (Pl.'s Dep. p. 15).  Plaintiff asked the guard to go to medical, but was told that he had to submit a sick call slip, which he did.  (Pl.'s Dep. p. 17).  He testified that he had trouble using the bathroom and missed several meals because he was in too much pain to leave his cell prior to receiving medical attention.  (Pl.'s Dep. pp. 21-22).

Plaintiff saw Defendant Peek approximately four days after the incident.  (Pl's. Dep. p.22).  Plaintiff told Peek that he had injured his knee, complained of pain, and showed her the swelling.  (Pl.'s Dep. p. 26).  Peek was not able to fill out the prison's protocol form specifically for sprains and other orthopedic injuries because the office was out of those forms that day, although she followed a copy of the protocol as she made her notes.  (Peek Dep. pp. 99-100).  Peek's notes indicate that Plaintiff told her that he fell in the yard last week and injured his right knee. (Peek Dep. p. 149).  She also recorded swelling, although her notes do not indicate how much, decreased range of motion, crepitus, a limp, and Plaintiff's subjective complaints of pain.  (Peek Dep. pp. 152-59).  Peek gave him an ice pack for the swelling, which Plaintiff testified lasted twenty minutes, and also prescribed ibuprofen.  (Pl.'s Dep. pp. 26-27).  Peek later testified that she actually gave Plaintiff a twenty-four hour pass to have ice.  (Peek Dep. pp. 125-26).  Plaintiff testified that he did not receive the ibuprofen until eight or nine hours after it was prescribed, however, the nurse's notes indicate that Plaintiff informed her he had been taking Tylenol on his own prior to seeing her.  (Pl.'s Dep. p. 27); (Peek Dep. p. 157).  Peek referred Plaintiff to see a physician or physician's assistant.  (Peek

Dep. p. 164). She did not do so on an emergency basis because Plaintiff had told her that he had injured his knee a week ago, he was able to walk, her examination showed no deformities, and his temperature was normal, which typically indicates that circulation and nerve conduction is not damaged. (Peek Dep. pp. 161-62). Peek also testified that she was not specifically trained to identify ACL injuries. (Peek Dep. p. 162). She would refer on an emergency basis if a patient presented with extreme swelling, deformity, lack of circulation, and lack of nerve conduction. (Peek Dep. p. 162).

Plaintiff next saw an unidentified nurse practitioner (or possibly a physician's assistant) approximately four days after he saw Peek, on May 11, 2009. (Pl.'s Dep. p. 28); (Doc. 95-7, p. 1). The nurse practitioner indicated that Plaintiff may have a torn ACL, and gave him a low gallery permit, a low bunk permit, crutches, and more pain medication. (Pl.'s Dep. pp. 28-29). She also made him a doctor's appointment. (Pl.'s Dep. p. 30). Plaintiff saw Dr. Obadina on May 19, 2009. (Pl.'s Dep. p. 30). Obadina told Plaintiff his knee might be broken and scheduled an x-ray. (Pl.'s Dep. p. 33). The x-ray showed no fractures. (Pl.'s Dep. p. 34). Plaintiff saw Obadina approximately three weeks after his first visit; at the second visit, Obadina gave him his x-ray results, took away his crutches, and measured him for a knee sleeve. (Pl.'s Dep. pp. 34-36). Plaintiff then missed several scheduled sick calls because he was scheduled for mandatory schooling. (Pl.'s Dep. p. 108-109). Plaintiff did not get another appointment regarding his knee until January 2010; although he continued to complain of knee pain at other doctor's visits, Obadina would tell him that he couldn't address his complaints of knee pain on visits regarding other health issues. (Pl.'s Dep. pp. 37-38).

Plaintiff got a doctor's appointment in January because his knee pain had not improved since June. (Pl's Dep. p. 39). Plaintiff first saw Dr. Wahl on January 27, 2010 and requested an MRI at that time. (Pl.'s Dep. p. 41; Wahl Dep. p. 101). Wahl found Plaintiff's gait to be normal and no swelling in the right knee. (Wahl Dep. p. 107). Wahl also performed several range of motion tests

which were negative. (Wahl Dep. p. 109). Plaintiff testified that Wahl told him he didn't need an MRI because his x-ray was negative. (Pl.'s Dep. p. 42).

In February, Wahl scheduled Plaintiff for physical therapy. (Pl.'s Dep. p. 44). Plaintiff received approximately five weeks of physical therapy, during which time he continued to experience pain in his knee. (Pl.'s Dep. p. 49). Wahl testified that she signed off on a recommendation by Plaintiff's physical therapist to send Plaintiff to get an MRI and an orthopedic consult on February 22, 2010, although this is not shown in Plaintiff's progress notes. (Wahl Dep. pp. 118-119). However, it appears as if Dr. Shepard actually presented that course of action at Wexford's collegiate review on March 8, 2010 and then appealed the initial decision denying the MRI. (Wahl Dep. pp. 185-86); (Shepherd Dep. pp. 84-85; 91-92). Plaintiff received an MRI as ordered by Dr. John Shepard on April 7, 2010 at Memorial Hospital in Carbondale, Illinois. (Pl.'s Dep. p. 53). Plaintiff met with Wahl approximately three weeks later, at which time she told him that the MRI showed a torn ACL and ligament damage. (Pl.'s Dep. p. 56). Specifically, the MRI showed that Plaintiff had a 1) torn meniscus; 2) a complete/near complete tear of his ACL; 3) a fracture of the medial tibial plateau, and 4) osteoarthrosis (Doc. 95-2).

Wahl's notes also indicated that on April 26, 2010, she participated in a collegial conference between herself and a physician and nurse on Wexford's utilization management team, located in Pittsburgh. (Wahl. Dep. p. 128). During the collegial conference, Wahl made a second request for an orthopedic consult, but utilization management suggested an alternate plan of using a knee immobilizer. (Wahl Dep. p. 128). Wahl ordered a knee immobilizer and additional physical therapy for eight weeks. (Pl.'s Dep. p. 56). Wahl next examined the Plaintiff on July 1, 2010. (Wahl Dep. p. 130). Plaintiff discussed his continuing pain, which Plaintiff described at his deposition as "8 out of 10." (Pl.'s Dep. pp. 59-60). She presented his case again to utilization management on July 6, 2010; this time they approved the orthopedic consult. (Wahl Dep. p. 131).

4

The consult recommended surgery as an option. Wahl met with the colligate review committee again on August 16, 2010, and utilization management approved Plaintiff for surgery. (Wahl Dep. p. 132). He had surgery on August 30, 2010. (Pl.'s Dep. p. 65). Plaintiff alleges that post-surgery, he still experiences pain of 7 out of 10 and has limited range of motion as a result of delaying the surgery. (Pl.'s Dep. p. 71).

Wexford has promulgated policies addressing care of knee injuries. Their Orthopedic Surgery Policy and Guideline requires a referral after six weeks for an acute injury; likewise, the same policy requires a referral after six months if symptoms include chronic pain and crepitus. Wahl testified that when the Wexford Guidelines indicate that a patient should be referred, they mean to the collegial conference, not to a specialist. (Wahl Dep. p. 150). Wexford doctors follow Wexford medical and treatment policies. (Shepherd Dep. p. 43). Several witnesses in this case testified that the Wexford collegial conference often rejects medical plans in favor of more conservative courses of treatment. (Varel Dep. p. 30); (Shepherd Dep. p. 45). The collegial conference's treatment plans may be based on studies, as opposed to an independent evaluation of the patient. (Shepherd Dep. p. 47-48). If the proposed treatment fails, the medical provider takes that patient's case back to the collegial conference. (Shepherd Dep. p. 48).

## DISCUSSION

a) *Summary Judgment Standard*

Summary judgment, which is governed by FEDERAL RULE OF PROCEDURE 56, is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. **Dynegy Mktg. & Trade v. Multiut Corp., 648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P. 56(a)).**[1] The party seeking

---

[1] Though Rule 56 was amended in 2010, the amendment did not change the summary judgment standard. **Sow v. Fortville Police Dept., 636 F.3d 293, 300 (7th Cir. 2011).**

summary judgment bears the initial burden of demonstrating, based on the pleadings, affidavits and/or information obtained via discovery, the lack of any genuine issue of material fact. **Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).** A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. **Anderson, 477 U.S. at 248**. If a party fails to properly address another party's assertion of fact, courts may "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." **FED. R. CIV. P. 56(e).** A mere scintilla of evidence supporting the non-movant's position is insufficient; a party will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. **Albiero v. City of Kankakee, 246 F.3d 927, 931–32 (7th Cir. 2001). See also Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is . . . the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (internal quotation marks omitted).** There is "no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." **Van Antwerp v. City of Peoria, 627 F.3d 295, 297 (7th Cir. 2010); accord Anderson, 477 U.S. at 248 (material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. **Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008).**

### b) Deliberate Indifference Standard

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. **Greeno v.**

***Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. ***Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. ***Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011), *citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006).** The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. ***Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. ***Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm.") (internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. ***Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).**

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. ***Greeno*, 414 F.3d at 653.** The plaintiff need not show the physician literally ignored his complaint, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded it. ***Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).** Courts give deference to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of

7

acceptable courses." **Jackson v. Kotter, 541 F.3d 688, 697–98 (7th Cir. 2008).** A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment. **McGowan v. Hulick, 612 F.3d 636, 641 (7th Cir. 2010). See also Estelle, 429 U.S. at 107 (whether additional diagnostic techniques or treatments were needed was a "classic example of a matter for medical judgment.").** However, persisting in a course of treatment known to be ineffective states a claim under the Eighth Amendment. **Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005) (finding deliberate indifference where medical defendants persisted in a course of conservative treatment for eighteen months despite no improvement).** Deliberate indifference may also be shown when a medical provider refuses to refer a patient to a specialist for treatment of a painful medical condition that clearly requires a referral. **See Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010); Snyder v. Hayes, 546 F.3d 516, 526 (7th Cir. 2008).**

1. Nurse Peek – deliberate indifference

The parties do not appear to be disputing that a torn ACL is a serious medical condition. Therefore, the Court will limit its analysis to whether the defendants were subjectively culpable. Plaintiff has made a deliberate indifference claim against Peek because he had to wait four days to see her, and then had to wait another four days before he saw another health care provider based on her referral. He also claims she was deliberately indifferent because she only prescribed Motrin and an ice pack.[2] Finally, Plaintiff takes issue with Peek's failure to use a protocol sheet specifically for sprains and other injuries. Peek is entitled to summary judgment.

---

[2] There are some minor factual difference between Plaintiff's testimony and the medical record. For example, Plaintiff believes he was referred to a nurse practitioner and prescribed Motrin, while other records and testimony indicate that he was referred to a physician's assistant and prescribed Tylenol. The Court will use Plaintiff's version of events, however, these facts are not critical to its determination on the relevant Motion, and the Court declines pass judgment on which version is true.

8

First, there is no indication that Peek was aware that Plaintiff had to wait four days from his injury until he saw her. Plaintiff testified that he told the guards, not Peek, that he needed urgent medical attention. The guards, not Peek, were the ones that told him he needed to use the sick call procedure. Therefore, Peek is not responsible for the four day delay between Plaintiff's injury and the time he received medical attention.

Second, Plaintiff alleges that Peek was deliberately indifferent because she failed to refer him on an emergency basis, and instead put him in the sick call line. Plaintiff asserts that the only reason that Peek did this was because of the initial four- day delay, and that Peek reasoned his case was not an emergency because he had already waited for care. However, Peek testified that she also considered Plaintiff's lack of deformity, his ability to ambulate, and the fact that he was not showing any signs of compromised circulation or other symptoms that could show that he was in danger of losing the limb. Dr. John Shepherd testified that an emergency would constitute a dislocation, a break in the skin, or inability to walk. (Shepherd Dep. p. 25). It appears that Peek evaluated Plaintiff for those symptoms, and when they were not present, she referred him on a non-emergency basis. This is not deliberate indifference. Peek considered Plaintiff's symptoms and made a medical determination that Plaintiff disagreed with. There is also no evidence that Peek had any control over how long Plaintiff waited to see a medical care provider after she referred him non-emergently.

Plaintiff also takes issue with the way Peek took notes, implying that she failed to record pertinent information because she did not have the proper worksheet. Peek testified that she referred to the proper worksheet while making her notes. Although there appears to be some fields that she did not comment on, Peek testified that a medical provider would have understood those criteria to be negative in the absence of comment. Further, Plaintiff has not offered any testimony that his care was delayed or changed specifically by the failure to use the correct protocol sheet. Peek's decision not to refer emergently was based on criteria that she did list in her notes. Plaintiff

9

was referred on a non-emergent basis, and the medical records contained notations about his relevant symptoms, including the fact that he was limping, reported that he was uncomfortable and in pain, there was swelling, and his knee made a grinding noise. This is not deliberate indifference.

Finally, Plaintiff objects to Peek's prescribing Motrin and giving him an ice pack, implying that she could have done more. However, Plaintiff has not submitted any evidence, that as a nurse, Peek had the authority prescribe something stronger than an OTC painkiller. Additionally, Peek submitted evidence that she did not merely give Plaintiff one bag of ice, but rather, that she gave him a pass that permitted him to get ice for 24 hours. Plaintiff has not submitted any evidence that he attempted to get more ice after the first bag melted. Plaintiff has also not submitted any evidence that Peek, in her duties as a nurse, could have done more than what she did, other than refer him emergently, which has been discussed above. Additionally, there is other testimony in the record that it is common to offer a patient ice, painkillers, and anti-inflammatories after an injury but before seeking further medical attention. (See Varel Dep. p. 32). A knee may be easier to evaluate after the swelling and acute pain has diminished. (See Varel Dep. p. 32). Therefore, there is no evidence that Peek's treatment constituted deliberate indifference. For these reasons, Nurse Peek should be granted summary judgment and **DISMISSED**.

### 2. Dr. Wahl – Deliberate Indifference

Whether Wahl exhibited deliberate indifference is a closer call. Plaintiff first saw Wahl on January 27th, 2010. His chart clearly contained a notation from May of 2009 that an ACL tear should be ruled out. It was also clear at this time that Dr. Obadina had never taken steps to rule out an ACL tear by conducting an MRI in the six months he had been treating Plaintiff. However, despite this oversight, Wahl did not take steps to rule out an ACL tear until February 22, 2010, when she signed off on the physical therapist's recommendation to present a request for an MRI to Wexford's collegial review board. This is a delay of almost a month. Additionally, the collegial

review found Wahl's presentation insufficient and requested that Shepard re-evaluate Plaintiff and re-present his case to them. This caused additional delays. A reasonable jury could find that this is deliberate indifference in light of the fact that Wahl was aware that the issue had been flagged in May of 2009 without follow-up and yet contributed to further delay in actually ruling out an ACL tear.

Additionally, after receiving the MRI results showing damage in March of 2010, Dr. Wahl acquiesced to the colligate review panel's recommendation that she persist in sending Plaintiff to physical therapy in lieu of referring him to a specialist even though Plaintiff reported no improvement from his previous round of physical therapy. Plaintiff testified that he had been in pain continuously since the accident. He was not referred for surgery until nearly fifteen months had elapsed, and he reported that physical therapy was not helping him as early as March, five months prior to the surgery. Therefore, it is for the jury to decide whether the decision to refer Plaintiff for physical therapy a second time, even though he had just completed an unsuccessful round of physical therapy was deliberately indifferent. Plaintiff had been reporting pain for several months and there were indications that he needed a specialist consult. Wahl continued to delay referring him. The Court cannot say at this time that Wahl is entitled to summary judgment, and therefore her Motion will be denied.

### 3. Wexford Health Sources- Deliberate Indifference

Wexford argues that they are entitled to summary judgment because none of their employees are liable. As an initial matter, while this is generally the law, the 7th Circuit has created an exception. "A municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." **Thomas v. Cook County Sheriff's Dept., 604 F.3d 293, 305 (7th Cir. 2009) (emphasis in original).** However, as the Court finds that Wahl may be liable for deliberate indifference, the Court need not address this line of argument further.

11

Wexford also argues that Plaintiff has not pointed to any express policy which caused a constitutional deprivation. On the contrary, Plaintiff has pointed to Wexford's policies requiring referral to its own internal collegial conference in order to make medical decisions for specific individuals. Plaintiff has also submitted evidence that Wexford's custom and practice is to make recommendations for conservative courses of treatment based on general medical studies and the overall treatment experience of the members of the collegial conference. The members of the collegial conference work out of Pittsburgh, PA, and rely on local physicians to actually examine patients. Plaintiff submitted evidence that when treating medical providers make more aggressive recommendations to the collegial conference, these recommendations are almost always rejected in favor of the more conservative course of treatment, and that the collegial conference will wait until the conservative course of treatment has failed before recommending another option. Plaintiff submitted testimony in his case that his medical providers recommended an orthopedic consult, but that the collegial conference rejected this course of treatment in favor of a course of physical therapy, which Plaintiff had already tried. Deliberate indifference can be shown by persisting in a known ineffective course of treatment, and Plaintiff has submitted evidence from which a reasonable jury could find that the Wexford's collegial conference recommended that course of action. Therefore, because Plaintiff has pointed to actual policies and submitted evidence on Wexford's customs in carrying out those policies, and because a jury could find that those policies contributed to a constitutional injury, Wexford is not entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** as to Defendant Peek, and the clerk of the Court is instructed to dismiss her as a party and enter judgment in her favor at the close of this case. Summary Judgment is **DENIED** as to Defendants Wahl and Wexford Health Sources.

**IT IS SO ORDERED.**

**DATED: July 31, 2013**

                                                    **/s/ *Stephen C. Williams***
                                                    **STEPHEN C. Williams**
                                                    **United States Magistrate Judge**

Case 3:10-cv-00769-SCW   Document 102   Filed 07/31/13   Page 13 of 13   Page ID #829